# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

    v.                                      Case No. 15-CR-123

**BRANDON WEATHERS**
       **Defendant.**

## DECISION AND ORDER

The government charged defendant Brandon Weathers with unlawful possession of a firearm. Police officers discovered the gun after conducting a Terry[1] stop based on suspicion that defendant was looking to commit a robbery while walking through a residential area on the south-side of Milwaukee. Defendant filed a motion to suppress, arguing that the police lacked reasonable suspicion for the stop. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b).

## I. FACTS AND BACKGROUND

**A.**    **Hearing Testimony**

At the evidentiary hearing before the magistrate judge, the government called Milwaukee police officers Guadalupe Ramirez-Cervantes, who made the initial observations of defendant's allegedly suspicious behavior, and Jonathan Caya, who conducted the stop. I summarize the officers' testimony below.

---

[1]See Terry v. Ohio, 392 U.S. 1 (1968).

### 1. Officer Ramirez-Cervantes

Ramirez-Cervantes testified that on the evening of April 16, 2015, he and his partner, Erik Andrade, received an undercover assignment to patrol a south-side neighborhood due to a concern about armed robberies in the area. (Tr. at 4-6.) Specifically, the robbers were waiting for individuals to leave a bar, observe if they were highly intoxicated, and then rob them. These robberies had been committed by many people, a mixture of white and Hispanic young men. (Tr. at 7, 32.) Ramirez-Cervantes did not know how many such robberies had occurred. (Tr. at 6.)

Ramirez-Cervantes testified that his work in the area was designed both to react to robberies that had already occurred and to prevent robberies from happening. (Tr. at 7.) He indicated that, in order to prevent a robbery, he would look at various things, including the suspect's movement, where he was going, and what area he was in. (Tr. at 8.) Ramirez-Cervantes would see if the person kept looking around his surroundings to determine if anyone was watching. He would also see if the suspect was "indexing," meaning holding on to a particular part of his body. Ramirez-Cervantes testified that a person carrying a concealed firearm tended to "index" to check to make sure the firearm was still there. (Tr. at 8.) Ramirez-Cervantes also looked for dark colored clothing and hooded sweatshirts. (Tr. at 9.)

Ramirez-Cervantes testified that at about 7:45 p.m., while he and his partner patrolled the area in an unmarked vehicle, he observed a man later identified as defendant walking northbound on the east side sidewalk of Shea Avenue (Tr. at 12, 34), "looking back and forth around his shoulder backwards like he's looking around to make sure no one is there." (Tr. at 10:18-20.) Ramirez-Cervantes testified that when he first saw defendant he was about 10-15 feet away, driving northbound on Shea Avenue, moving in the same direction defendant was

2

Case 2:15-cr-00123-LA   Filed 12/17/15   Page 2 of 15   Document 31

walking (Tr. at 12, 34), at about 10 mph (Tr. at 35). Ramirez-Cervantes testified that the police were particularly concerned about robberies outside bars, and at no time did he see defendant loitering around a bar. (Tr. at 31.) The robbery suspects they were looking for included a mix of white and Hispanic individuals. They had no description that matched defendant (an African-American), nor had they received any citizen complaints in the area that evening. (Tr. at 32.)

Ramirez-Cervantes testified that he also observed a Hispanic man and a five to eight-year-old child in the front of a residence on Shea Avenue doing yard work. (Tr. at 12, 36.) The residence had a very steep hill in front of it, and the man was on top of the hill. (Tr. at 36.) Defendant looked in the direction of the Hispanic man and started walking onto the property as if to approach the man. (Tr. at 13, 36.) The officers slowed down and paused in front of the residence, defendant looked around and saw their vehicle, and then continued walking northbound. (Tr. at 13, 38-39, 43-44.)

The record contains conflicting evidence as to whether defendant actually entered the Hispanic man's property before moving on. On direct examination, Ramirez-Cervantes stated that defendant "started walking onto [the] property line." (Tr. at 13:3.) However, on cross examination he indicated that defendant took "approximately three steps [onto the hill] before he observed [the officers'] vehicle." (Tr. at 38:15-16.) In his report about the incident, Officer Caya wrote: "As [defendant] watched the Hispanic male he began to turn towards the front stairs that led up the front of the residence while scanning the area." (Tr. at 41:3-5.) The report does not indicate that defendant crossed the property line.[2] (Tr. at 41.)

---

[2] Ramirez-Cervantes did not write a report regarding this incident. (Tr. at 27.) However, he did review Caya's report, finding it accurate and complete. (Tr. at 28.) Caya testified that he prepared a complete and accurate report of this incident based on his observations and the broadcasts from Ramirez-Cervantes, and that he gave Ramirez-Cervantes a chance to review

3

In any event, Ramirez-Cervantes testified that the Hispanic man did not seem alarmed, and Ramirez-Cervantes did not see defendant do anything that appeared threatening. (Tr. at 39.) For instance, Ramirez-Cervantes did not see defendant try to take anything out of his clothes or appear to manipulate any object, nor did he see any bulges in defendant's clothes or observe defendant conduct a safety check as if to keep a gun from slipping out of his waistband. (Tr. at 40, 42, 43.) Ramirez-Cervantes further testified that he did not feel the need to intervene at that point to protect the people in the yard. (Tr. at 56.)

Nevertheless, based on defendant's actions of looking around and then starting to approach the Hispanic male, Ramirez-Cervantes alerted his partner because he believed defendant was in the process of committing a robbery. (Tr. at 13.) Ramirez-Cervantes also testified that defendant was wearing dark clothes and indexing with his hands in the sweatshirt pocket in front of his body. (Tr. at 14.) Ramirez-Cervantes believed, based on defendant's change in direction, that defendant saw their vehicle, got scared, and so continued walking. (Tr. at 15.) Ramirez-Cervantes admitted that it might seem unusual to a pedestrian to have someone driving behind him at 10 mph, especially if the pedestrian had heard there were armed robberies in the area; it might cause the person to look around and wonder what was going on. (Tr. at 35.) Ramirez-Cervantes further testified that he and his partner were driving an SUV with tinted windows (Tr. at 57), and he could understand how a pedestrian would want to keep an eye on a slow moving SUV with tinted windows (Tr. at 58). Ramirez-Cervantes also admitted that it was not unusual for a person to be wearing a hooded sweatshirt given the season. (Tr. at 37.) At the time of the encounter, it was dusk and about 49 degrees outside.

---

the report. (Tr. at 79-80.)

4

(Tr. at 29.) Ramirez-Cervantes conceded that the cold temperature provided a good reason for defendant to have his hands in his pockets. (Tr. at 14.)

Defendant continued walking northbound until he reached the break of an alley and then proceeded to enter the alley. (Tr. at 15.) Ramirez-Cervantes continued driving northbound, made a U-turn, and parked in a lot located on Shea Avenue and Pierce Street to get a better view of defendant in the alley. (Tr. at 15-16.) Ramirez-Cervantes testified that from the lot he could look straight down the alley, with an unobstructed view. (Tr. at 18.) However, he did not get out of the SUV, the alley began more than 100 feet from his location and ended more than 400 feet away, and he did not have binoculars. (Tr. at 44-46).[3]

Ramirez-Cervantes testified that defendant did not seem to be walking purposefully from one point to another but rather seemed to be "casing," looking around for potential targets. (Tr. at 17.) Defendant walked south/southeast through the alley, which ran on an angle, "clearing each gangway left and right in a slow manner." (Tr. at 18:2-3.) Ramirez-Cervantes testified that defendant did a "curious check" looking back and forth through the gangways (the space between the houses) throughout the whole alley. (Tr. at 19.) "It would be a slow pause and [defendant] would look left, he would look right." (Tr. at 20:8-9.) Defendant also kept his hands in his pockets, which caused Ramirez-Cervantes further concern. (Tr. at 20.) However, Ramirez-Cervantes admitted that he could not see anything to the right or left side; he could just see straight down the alley. (Tr. at 47.) Thus, he could not tell where any gangways were located from that vantage point, nor could he tell what defendant was looking at. (Tr. at 49.)

---

[3]Defendant's investigator measured the distance from the parking lot to the start of the alley at approximately 150 feet; to the end of the alley measured 413 feet. (Tr. at 88.)

5

Defendant never entered any of the properties off the alley.[4]  (Tr. at 49.)

Defendant continued walking to the top of the alley and then turned left.  (Tr. at 20.) Ramirez-Cervantes radioed to uniformed officers Coe and Caya, who were assigned to a "takedown" car, regarding his observations.  (Tr. at 21.)  Ramirez-Cervantes testified that he communicated his observations to the other officers in detail.  (Tr. at 22.)

Once he lost sight of defendant, Ramirez-Cervantes changed location, proceeding south on Shea Avenue to National Avenue, turning left and parking on the 3200 block of National Avenue facing eastbound.  (Tr. at 22-23.)  Ramirez-Cervantes testified that once the alley ends it comes back onto National Avenue, and he believed defendant was going to come back to National.  (Tr. at 23.)

Once he had parked on National, Ramirez-Cervantes saw defendant come out of the alley and proceed to walk eastbound on the north side of National Avenue (moving away from where Ramirez-Cervantes was parked).  (Tr. at 24-25.)  Defendant still had one hand in his pocket but now in his other hand he had a cell phone.  Defendant continued to look around. (Tr. at 25.)  Ramirez-Cervantes testified that based on his observations he asked Caya and Coe to conduct a stop/field interview.[5]  (Tr. at 26, 50-51.)

---

[4]Caya's police report indicated that defendant "walked at a slow pace and began peering down both the east and west gangways adjacent to residences in a suspicious manner."  (Tr. at 51:15-17.)  The report does not indicate that defendant stopped; he continued to walk throughout the time he was in the alley.  (Tr. at 51.)

[5]Both Ramirez-Cervantes and Caya testified that a field interview is a stop based on reasonable suspicion.  (Tr. at 51, 80.)  See also United States v. Smith, 794 F.3d 681, 686-87 (7th Cir. 2014) (indicating that a "field interview," according to the Milwaukee Police Department's Standard Operating Procedure, is "the brief detainment of an individual . . . based on articulable reasonable suspicion," i.e., a Terry stop).

6

### 2. Officer Caya

Caya testified that he was several blocks away from Ramirez-Cervantes's location when he first heard the broadcast from the undercover vehicle. (Tr. at 62.) Ramirez-Cervantes reported that he saw defendant walking down Shea Avenue, approach a residence where a Hispanic man and a child were doing yard work, with his hands in his pockets scanning back and forth. (Tr. at 63.) Caya testified that at that point their suspicions were aroused, but they wanted to further observe defendant's actions, as they were "quite unsure at that point if [defendant] had intended to make contact with the [Hispanic man.]" (Tr. at 64:11-12.) Caya and his partner headed in defendant's direction. (Tr. at 64-65.)

Ramirez-Cervantes broadcast that he had parked to further observe defendant's actions as defendant walked down the alley. (Tr. at 65.) Ramirez-Cervantes indicated that defendant walked extremely slow, hands in the front pocket of his sweatshirt, looking methodically down each gangway, to the left and right, as if peering down the gangways. (Tr. at 66.) Defendant did this throughout the entire alley, which increased Ramirez-Cervantes's suspicions, so they made a collaborative decision to conduct a field interview. (Tr. at 67.) Ramirez-Cervantes reported that defendant was now on National Avenue headed eastbound. (Tr. at 68.) Caya testified that as he and his partner drove westbound on National they observed defendant walking eastbound on the north sidewalk. (Tr. at 69.) No one else matched the description Ramirez-Cervantes broadcast. (Tr. at 69-70.)

When Caya first saw him, defendant appeared to be making a phone call, while continuing to walk. (Tr. at 70.) The officers pulled over on the north side of the street, and Caya exited the squad. (Tr. at 70.) Caya did not notice any bulges in defendant's clothing. Nor did he see defendant do a security check, pull on his pants, or anything like that. (Tr. at

7

82.)

Caya approached defendant and asked, "can I talk to you real quick?" (Tr. at 71:21-22.) Caya testified that he tried to be friendly and casual. (Tr. at 71.) Defendant said "yeah" but continued to talk on his phone. (Tr. at 72.) After about 10 seconds passed, Caya told defendant that he needed to speak with him. (Tr. at 72.) At that point, Coe exited the squad and positioned himself to the right side of defendant, while Caya faced defendant. (Tr. at 73.) Caya testified that defendant continued to talk on the phone, seemingly ignoring Caya. (Tr. at 73, 83.) The officers then indicated, in an authoritative tone, that they were going to speak with defendant now, and Coe took defendant's phone. (Tr. at 73-74, 84.) Caya testified that at that point defendant was detained for an investigation; he was not going to walk away. (Tr. at 84.)

Caya testified that defendant appeared nervous, moving around a little bit and avoiding eye contact. (Tr. at 75.) Based on these observations and Ramirez-Cervantes's previous reports, Caya believed defendant may be armed. (Tr. at 75.) Defendant had his hands at his sides, but they moved to the pockets back and forth a little bit. (Tr. at 75.) Caya asked defendant if he had a firearm, and defendant said yes. (Tr. at 75.) Caya asked defendant if he had a concealed carry permit, and defendant said no. (Tr. at 76.) At that point, the officers indicated they would be taking defendant into custody for possessing the firearm. Coe removed the firearm from the right front pocket of defendant's hooded sweatshirt (Tr. at 77), and Caya handcuffed defendant (Tr. at 78).

**B.   Magistrate Judge's Recommendation**

The magistrate judge found that defendant was seized for Fourth Amendment purposes when the officers ordered him off the phone. As indicated, Caya testified that at that point defendant had been detained for further investigation.

8

The magistrate judge agreed with defendant that wearing a sweatshirt and placing one's hands in the pockets on a 49 degree evening is not suggestive of criminal activity, particularly given the absence of any noticeable bulges in defendant's sweatshirt. However, the magistrate judge found that other factors, including defendant's presence in a high crime area, looking furtively from side to side, dressed in dark clothing, sufficiently aroused the officers' suspicions. Coupled with defendant's aborted approach of the Hispanic man doing yard work when he realized he could be seen by the driver of the SUV, the magistrate judge found reasonable suspicion for a field interview.

The magistrate judge acknowledged but did not resolve the issue of whether defendant actually stepped onto the Hispanic man's property, noting that Ramirez-Cervantes's testimony that defendant took three steps onto the man's property was not necessarily inconsistent with Caya's report. "Although Caya's report, which stated only that [defendant] turned towards the man, may be less detailed than Ramirez-Cervantes's testimony, the evidence suggests that [defendant] intended to approach the man before noticing the approaching SUV. When viewed in combination with the other facts, the officers had reasonable suspicion to briefly detain [defendant]." (Recommendation [R. 23] at 9.)

In his objections, defendant faults the magistrate judge for relying on observations that could apply to practically anyone, overlooking facts that undermine a claim of reasonable suspicion, and failing to resolve the dispute as to whether he actually entered the Hispanic man's property.[6] The government counters that defendant's analysis seeks to evaluate his actions individually rather than in their totality and in context. See Matz v. Klotka, 769 F.3d

---

[6] He requests a de novo evidentiary hearing to resolve the dispute.

9

517, 523 (7th Cir. 2014) (noting that the court does not consider in isolation each variable but rather considers the sum of all of the information known to officers, including behavior that may in other circumstances be considered innocent), cert. denied, 135 S. Ct. 1901 (2015). The government argues that a de novo hearing is not necessary to resolve the detail of the extent of defendant's movement towards the man in the yard, as this was but one factor in the totality of the circumstances that led the officers to conduct the stop.

## II.  DISCUSSION

### A.   Legal Standards

In order to justify an investigative stop, the police need reasonable suspicion that a crime may be afoot. Gentry v. Sevier, 597 F.3d 838, 845 (7th Cir. 2010). The officers must be able to point to specific and articulable facts, which, taken together with the rational inferences drawn from them, reasonably warrant the intrusion. United States v. Rivers, 121 F.3d 1043, 1045 (7th Cir. 1997) (citing Terry, 391 U.S. at 21). "While reasonable suspicion requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999). Further, while otherwise innocent behavior may contribute to a belief that criminal activity is afoot, reasonable suspicion should not be based on circumstances that describe a large category of presumably innocent persons. See Reid v. Ga., 448 U.S. 438, 441 (1980); United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1126 (9th Cir. 2001). In evaluating reasonable suspicion, the court considers the totality of the circumstances known to the officers at the time of the stop, including the experience of the officers and the behavior and characteristics of the suspect. United States v. Swift, 220 F.3d 502, 506 (7th Cir. 2000). The government bears the burden of establishing

10

reasonable suspicion by a preponderance of the evidence. United States v. Uribe, 709 F.3d 646, 650 (7th Cir. 2013).

**B. Analysis**

Neither side objects to the magistrate judge's determination that the officers seized defendant when they demanded he speak with them and took his phone. Based on the evidence, it is plain that at that point defendant was not free to leave. See Smith, 794 F.3d at 684 (explaining that a seizure occurs when the police conduct would have communicated to a reasonable person that he was not at liberty to ignore them and go about his business). Accordingly, reasonable suspicion must be based on the officers' observations before that point; Caya's observations after defendant had been seized, including defendant's nervousness, avoidance of eye contact, and hand movements, cannot be used to support the stop. See, e.g., United States v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995) (indicating that the court may not consider facts learned after the stop).

The factors relied upon the officers for the stop in this case are too vague, too general, and too common to provide a specific and articulable basis for believing defendant was casing the area for a robbery victim. In sum, the officers' observations failed to distinguish defendant from virtually any other young man walking in this area during these weather conditions.

As everyone seems to agree, reasonable suspicion cannot be based on a person wearing a hooded sweatshirt or placing his hands in the pockets during 49 degree weather. That defendant did so in a so-called "high crime" area does not change the analysis. As the Seventh Circuit recently explained,

> the simple fact that one's hands are in one's pockets is of a similar nature to one's avoiding eye contact. In other words, it is of little value. If one were to drive down any given street, it is likely that an uncountable number of citizens

11

would have their hands in their pockets. This does not change in high crime neighborhoods. Certain people prefer their hands to be pocketed – and why not? It can often be more comfortable. . . . On this, we should note that we do not believe that pocketed hands are entirely irrelevant nor do we create a categorical rule finding them so. Indeed, if one's hands are pocketed in an awkward way or if it seems that the individual is holding a larger-than-average item in his or her pocket, those facts could lead a reasonable officer to believe that a gun was contained therein, and support a frisk. But, the simple act of holding one's hands in should not be grounds for a search, even if it occurs at night in a high-crime area. We cannot support a rule that seemingly would allow those people who typically spend time in "low crime" areas (read: more affluent areas of town) to walk around with hands pocketed at night while not being subject to search, while depriving people in higher crime areas of that same ability.

<u>United States v. Williams</u>, 731 F.3d 678, 689 (7th Cir. 2013).

In this case, Ramirez-Cervantes testified that defendant was "indexing," but this was based on his observation that defendant had both hands in the front pocket of his sweatshirt. Ramirez-Cervantes did not see any bulges in the sweatshirt, and defendant did not appear to manipulate any object or conduct a safety check as if to keep a gun from slipping out.

Ramirez-Cervantes further testified that defendant looked about in a suspicious manner as he walked on Shea Avenue, but given the distance between them (10 to 15 feet) and the SUV's rate of speed (10 mph) Ramirez-Cervantes had barely one second to observe defendant's behavior before he reached the Hispanic man's house; this is simply too brief a time to reasonably draw any conclusions that defendant was searching for a robbery victim.

Ramirez-Cervantes placed particular emphasis on defendant's aborted approach of the Hispanic man. As indicated above, on direct examination Ramirez-Cervantes testified that defendant started walking onto the property line, saw the SUV, then continued walking. On cross, he stated that defendant took several steps onto the man's property. Given all of the

evidence, I find it more likely than not that defendant did not breach the property line.[7] First, Ramirez-Cervantes simply did not have enough time, even driving at a slow rate of speed and with a brief pause, to see defendant walk fifteen feet and then take three steps up a hill. Second, Ramirez-Cervantes testified that he broadcast his observations to Caya in detail, and Caya included those observations in his report. The report indicates that defendant "began to turn towards the front stairs that led up the front of the residence." (Tr. at 41:3-5.) The report says nothing about defendant crossing the property line. At the evidentiary hearing, Caya testified, based on Ramirez-Cervantes's real-time broadcast, that as defendant approached the residence on Shea defendant "slowed and started to look at" the Hispanic man doing yard work. (Tr. at 63:13.) Ramirez-Cervantes did not inform Caya that defendant crossed the property line. Indeed, as Caya testified, "At that point -- I guess at that point our suspicion was aroused, but he wanted to further observe his actions. We were quite unsure at that point if he had intended to make contact with the individual."[8] (Tr. at 64:9-12.)

Thus, the evidence shows that defendant paused in front of the residence, looked at the man doing yard work, noticed the SUV with tinted windows creeping up behind him, and then

---

[7] I see no need to conduct a de novo hearing to resolve this issue. See United States v. Raddatz, 447 U.S. 667, 674 (1980) (holding that the district court need not rehear contested testimony to make a de novo determination). As indicated above, the government contends that a de novo hearing is unnecessary because the discrepancy between Caya's report and Ramirez-Cervantes's testimony is not material.

[8] Even if defendant did intend to make contact with the Hispanic man, there is no reason to believe he did so with the intent to commit a robbery. The officers observed no bulges in defendant's clothes, defendant did not try to take anything out of his clothes or appear to manipulate any object, nor did he do anything that appeared threatening towards the man. The officers had received no reports that people were being accosted in their yards, there is no reason to believe a man doing yard work (unlike a recently departed bar patron) would have any money, and the Hispanic man raised no alarm (nor did he appear intoxicated, like the previous victims).

13

continued walking northbound. The officers presumed that defendant aborted his contact with the Hispanic man based on the SUV's approach, but it is important to note that this was an unmarked vehicle. This is not a case in which a suspect abruptly changed direction on seeing the police. Cf. United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003). Further, it would hardly be surprising that a person would become alarmed, look around, and keep moving when approached by a slow moving SUV with tinted windows.

The officers acknowledged that they did not have a sufficient basis for stopping defendant based on what they saw on Shea Avenue, so they continued to observe him as he walked down the alley. Ramirez-Cervantes testified that he saw defendant looking back and forth through the gangways, but given the distance (150-400 feet) and his vantage point Ramirez-Cervantes could not see where the gangways were and thus could not know what defendant was looking at as he strolled through the alley. Ramirez-Cervantes admitted that defendant did not approach anyone, enter anyone's property, or otherwise stray from the center of the alley as he walked. These observations again fail to distinguish defendant from any other young man walking through an alley on the south-side of Milwaukee.

Finally, the officers did not see defendant do anything unusual on National Avenue prior to the stop. He did not react nervously or evasively when first approached by the officers.

As the government notes, the court must consider the totality of the circumstances, considering defendant's actions in context. However, consideration of the other circumstances only weakens the claim of reasonable suspicion. The police were specifically concerned about robberies of inebriated bar patrons as they left taverns. The police never saw defendant around a bar, and the record contains no evidence of robberies of area residents outside their houses. Further, the previous robberies had been committed by white and Hispanic men;

14

defendant is African-American.

The government indicates that the police were concerned about increased robberies in the entire area, not just in the immediate vicinity of bars, and the fact that defendant did not match the description of previous robbers would not prevent him from drawing the officers' attention based on his behavior. Of course, if defendant had acted in an objectively threatening manner toward the Hispanic man or any other area resident, the police could have reacted, notwithstanding his race or different modus operandi. However, the police made no such observations, and the fact that defendant's appearance and conduct did not match the officers' specific concern is surely relevant.

The government also refers to this as a high crime area, but an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). In any event, the record contains no evidence that the area in which the stop occurred was high in crime other than the reported tavern robberies,[9] and the officers observed nothing that would lead them to believe defendant was about to commit such a crime.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (R. 11) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 17th day of December, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[9]Ramirez-Cervantes could not say how many such robberies had occurred in the area in the recent past. (Tr. at 6.)

15